IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 2:25-cr-538-BHH |
| | ) | |
| | ) | **ORDER** |
| Jorge Augusto Mero Figueroa, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant Jorge Augusto Mero Figueroa's ("Defendant" or "Figueroa") motion to dismiss the indictment for lack of jurisdiction under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure and 46 U.S.C. § 70504(a) of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70501, *et seq*. (ECF No. 45.) The government filed a response in opposition to Defendant's motion, and Defendant filed a reply. (ECF Nos. 52, 58.) On November 7, 2025, the Court held a hearing, at which hearing the Court received additional exhibits into evidence and heard the testimony of United States Coast Guard Officers Blake Gomez and Ethan Di Egidio. (ECF Nos. 60, 61, 62.) Now, for the reasons set forth herein, the Court denies Defendant's motion.

## FACTUAL BACKGROUND

On March 10, 2025, the United States Coast Guard "Cutter Stone" was on routine patrol in the eastern Pacific Ocean when it detected a go-fast vessel ("vessel") operating on the "high seas" in international waters between Ecuador and Costa Rica. The Coast Guard attempted to stop the vessel with verbal commands, but the vessel did not stop until a Coast Guard helicopter fired shots that disabled the vessel's engines. The occupants of the vessel jettisoned cargo from the vessel, and the Coast Guard ultimately recovered

approximately 1,804 kilograms of packaged cocaine from the water where the occupants had thrown it.

After the vessel was stopped, a Coast Guard boarding team gained control of the vessel via a long range interceptor and conducted a "Right of Visit" ("ROV") to determine nationality.  As can be seen both in images taken from the Coast Guard helicopter and in images captured by the boarding team, the port and starboard sides of the hull of the vessel include two-dimensional depictions of the Colombian flag, i.e., three horizontal bands of yellow, blue, and red, with the top yellow band covering half of the flag's height and the middle blue and bottom red bands each covering a quarter of the flag's height.[1] (See ECF No. 1 at 4; ECF No. 45 at 3, 5-6, 18-19, 21-23, 25-26; ECF No. 62 at 6.)  Indeed, the Victor Report from the ROV notes that the vessel contained painted-on markings of "yellow over blue over red horizonta[l]." (Id. at 28.)  Specifically, the Victor Report provides as follows regarding indicia of nationality:

| 3. | Indicia of nationality observed: | Description |
|---|---|---|
| | a. Physical flag flown? (CLAIM) | Y / (N) |
| | b. Registration Documents? (CLAIM) | Y / (N) |
| | c. Registration number on hull? | Y / (N) |
| | d. Homeport on hull? | Y / (N) |
| | e. Name on hull? | Y / (N) |
| | f. Painted-on markings? | (Y)/ N ___Yellow over blue over red horizonta___ |

(ECF No. 45 at 28; ECF No. 60 at 1.)

The boarding team identified two occupants aboard the vessel, Defendant Figeroa and Carlos Armando Cedeno, who are both Ecuadorian citizens based on their passports.

---

[1] As noted by Defendant in his motion, it is unknown whether the depictions of the Colombian flag were painted on the hull or were some sort of decals or stickers affixed to the hull. (See ECF No. 45 at 4, n. 5.)

According to the United States Coast Guard Report and the officers' testimony at the hearing, Officer Gomez spoke in English while Officer Di Egidio translated to Spanish when asking the two occupants of the vessel the questions from the right-of-visit form. (*See* Tr. of 11/7/25 hearing at 14-32.) Specifically, according to Gomez's testimony, both occupants of the vessel denied being the person in charge or the captain (as a replacement for the term "master") of the vessel (in response to question four on the Victor Report), and Officer Gomez wrote "N/A" on the form "because neither individual claimed to be the person in charge or the captain of the vessel." (*Id.* at 18.) Officer Gomez further testified that both occupants claimed "no" when asked whether they could claim nationality for the vessel. (*Id.*) Officer Gomez stated that he circled "N" on the form and put "N/A" in the corner to "doubl[e] down on efforts on the sheet itself, just ensuring it was put down." (Tr. of 11/7/25 hearing at 19.) Officer Gomez also testified that he asked the occupants, "does this vessel have nationality," and he circled "N" for "no" on the form. (*Id.* at 20.) Additionally, Officer Gomez stated that he asked the questions "all the way down" the form, and he documented questions five and six with "N/A" and by circling "N" for no, respectively. (*Id.* at 20-21.) The relevant portion of the Victor Report appears as follows:

4. Ask all suspects as a group, "Who is the master or person in charge (PIC) of the vessel?"
   "¿Quién es el capitán o persona a cargo del bote?"   N|A
   None/Master/PIC (circle one). Name: _____.
   If someone claimed to be the master or PIC, go to 4.a. If no one claimed to be the master/PIC, go to 5. If multiple people claimed to be the master or PIC, pause ROV questioning and consult District.
   a. Ask the master or PIC "Do you claim nationality for the vessel?"
      "¿Usted reclama alguna nacionalidad para el bote?"   N|A
      Y (N) Claimed nationality of vessel: _____; If yes, STOP questioning, go to 7. If no, go to 4.b.
   b. Ask the master or PIC "Does this vessel have a nationality?"
      "¿Este bote tiene alguna nacionalidad?"
      Y (N) Claimed nationality of vessel: _____; STOP questioning, go to 7.

5. Ask each person individually, "Are you the master or PIC?"
"¿Usted es el capitán o persona a cargo?"
(Stop asking if someone claimed to be the Master or PIC.)   N|A
None/Master/PIC (circle one). Name: _____.
   a. If a master or PIC is identified, return to Line 4.a., above, and proceed as necessary.
   b. If no master or PIC is identified, proceed to Line 6 below.

6. Ask each person individually, "Do you claim nationality for the vessel? Does this vessel have a nationality?"
"¿Usted reclama alguna nacionalidad para este bote? ¿Este bote tiene alguna nacionalidad?"
(Stop asking if someone claimed a nationality for the vessel. Treat that person as the PIC.)
Y(N) Name of PIC:_____. Claimed Nationality of Vessel: _____;
If no individual makes a claim of nationality for the vessel, STOP, go to 7.

(ECF No. 60 at 1.)

Officer Gomez also testified that he documented on the Alpha form that the vessel had no name, that there was no painted name on the vessel, and that there was no registry number for the vessel by marking "N/A" in each line  (Tr. of 11/7/25 hearing at 23-24.)  As for the question relating to nationality, Officer Gomez marked the Alpha form as follows:

6. Nationality: N|A  Master Verbal Claim: (Y /(N)) Flag Flown: (Y /(N)) Flag Location:  N|A   Vessel Docs: (Y (N))

(ECF No. 52 at 84.)  According to Officer Gomez, he could see that there was no physical flag being flown from the vessel, and the occupants never presented him with documents or papers after being questioned.  (Tr. of 11/7/25 hearing at 24-25.)

At the hearing, Officer Di Egidio also testified that he spoke Spanish with the occupants of the vessel, who responded to him in Spanish.  (*Id.* at 61.)  He further testified that he asked the occupants the specific questions included on the right-of-visit boarding sheet.  (*Id.* at 62, 67.)  Specifically, Officer Di Egidio stated that he asked the occupants multiple times, "who is the captain or person in charge of the vessel?"  (*Id.*  at 62-63.)  Di Egidio testified that the occupants acknowledged that they understood the question and

nodded but never came forward with any response.  (*Id.* at 63.)  (*See also* ECF No. 52 at 43 (stating that Officer Gomez "started the ROV with the translator and none of the crewmen claimed to be the person in charge of the vessel or claim nationality for the vessel"); *Id.* at 49 (stating that Officer Di Egidio assisted Officer Gomez in conducting the ROV).)  Di Egidio also testified that he asked if either occupant wanted to make a claim of nationality for the vessel, and both occupants answered "no."  (*Id.*)

The boarding team ultimately arrested both occupants of the vessel and removed them to the Cutter Stone.  The boarding party also took photographs of the vessel and inventoried its contents before scuttling the vessel at sea.

On March 17, 2025, both occupants of the vessel were charged in a criminal complaint and affidavit with possession with intent to distribute a controlled substance while on board a covered vessel subject to the jurisdiction of the United States, pursuant to 46 U.S.C. § 70503(a)(1), and jettisoning property that is subject to forfeiture under section 511(a) of the Comprehensive Drug Abuse Prevention Control Act of 1970 (21 U.S.C. 881(a)), pursuant to 46 U.S.C. § 70503(a)(2).  (ECF No. 1.)

The occupants were subsequently charged in an three-count indictment filed on April 8, 2025, with: (1) conspiracy to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b); (2) knowingly and intentionally possessing with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70503(a)(1); and (3) jettisoning property that is subject to forfeiture, specifically a mixture

or substance containing a detectable amount of cocaine, aboard a vessel that is subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70503(a)(2). (ECF No. 7.)

## STANDARDS OF REVIEW

### I.     Rule 12 of the Federal Rules of Criminal Procedure

Rule 12 of the Federal Rules of Criminal Procedure provides that defendants "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). This includes a motion asserting that the court lacks jurisdiction. Fed. R. Crim. P. 12(b)(3)(B).

### II.     The Maritime Drug Law Enforcement Act ("MDLEA")

The MDLEA prohibits possession of a controlled substance with the intent to distribute while on board a "covered vessel." 46 U.S.C. § 70503(a)(1). The MDLEA also prohibits jettisoning property that is subject to forfeiture under § 511 of the Comprehensive Drug Abuse Prevention and Control Act on board a "covered vessel." 46 U.S.C. § 70503(a)(2).

The term "covered vessel" is defined broadly and includes "a vessel of the United States or a vessel subject to the jurisdiction of the United States." *Id.* § 70503(e). Among the types of vessels listed as "subject to the jurisdiction of the United States" are a "vessel without nationality." *Id.* § 70502(c)(1)(A). A "vessel without nationality" is defined in relevant part as follows:

> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B) a vessel aboard which the master or individual in charge fails, on request

6

of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel;

(C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality; and

(D) a vessel aboard which no individual, on request of an officer of the United States authorized to enforce applicable provisions of United States law, claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e).

*Id.* § 70502(d)(1)(A)-(D).  Paragraphs (1) and (2) of subsection (e) state that a claim of nationality or registry includes only:

(1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;

(2) flying its nation's ensign or flag; or

*Id.* § 70502(e)(1)-(2).

Lastly, the MDLEA explicitly states that the "jurisdiction of the United States with respect to a vessel subject to [the MDLEA] is not an element of an offense" and that "[j]urisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge" (the "Jurisdictional Inquiry").  *Id.* § 70504(a).  To satisfy the jurisdictional inquiry, the government must prove by a preponderance of the evidence that a defendant was aboard a vessel covered under the MDLEA.  *See United States v. Matos-Luchi*, 627 F.3d 1, 5 (1st Cir. 2010).  If the Government fails to meet this burden, then the proper disposition is to dismiss the indictment.  *See United States v. Prado*, 933 F.3d 121, 153-54 (2d Cir. 2019).

## **DISCUSSION**

In his motion to dismiss, Defendant asserts that the vessel from which he was arrested on the high seas in March of 2025 was not a "covered vessel" as defined in the MDLEA because the hull of the vessel clearly displayed the flag of Colombia.  (ECF No. 45 at 9.)  According to Defendant, the vessel's display of a two-dimensional flag is an accepted claim of nationality under 46 U.S.C. § 70502(d)(1)(D), and he asserts that the Coast Guard otherwise failed to follow the procedures set forth in the MDLEA to determine that the vessel was "without nationality."

In response to Defendant's motion, the government notes that the MDLEA allows a vessel to make a claim of nationality by "flying its nation's ensign or flag," 46 U.S.C. § 70502(e)(2), but the government argues that the plain language of the statute, congressional intent, and maritime tradition all require the actual, physical *flying* of a nation's ensign or flag in the air, such that a flag depicted on the side of a vessel's hull is not "flying" for purposes of making a claim of nationality.  To that end, the government urges this Court to follow the Eleventh Circuit's decision in *United States v. Obando*, 891 F.3d 929, 932 (11th Cir. 2018).

In *Obando*, the Eleventh Circuit determined that the United States had jurisdiction over a vessel and its crew "because the painted Colombian flag on its hull was not 'flying' for purposes of making a 'claim of nationality or registry.'" *Id.* at 933.  There, as in this case, the crew members did not produce documents evidencing the vessel's nationality or make a verbal "claim of nationality or registry" pursuant to 46 U.S.C. §§ 70502(e)(1) and (3), but the crew members argued that "the painted flag on the side of the vessel constituted a claim of Colombian nationality that obliged the Coast Guard to ask Colombian officials

whether the vessel was registered there and whether Colombia consented to the exercise of jurisdiction by the United States." *Obando*, 891 F.3d at 934. The court found that the crew members' argument failed because "a flag painted on a vessel does not fly." *Id.* at 933-34. After outlining the ordinary meaning of the term "flying" and both maritime etiquette and other federal statutes that use the term, the court noted that "whether the Coast Guard considers a painted flag to be an assertion of national affiliation is not the same question as whether that flag is 'flying under the act,'" and the court ultimately concluded that the term "'flying' requires a flag to be hoisted in the air." *Id.* at 935, 938.

In his reply brief, Defendant first argues that the Coast Guard was required to investigate whether claims of nationality were made without relying on a verbal response. (ECF No. 58 at 2.) Stated differently, Defendant asserts that, under 46 U.S.C. § 70502(d)(1)(D), "an individual on the high seas need not identify himself or make any statement," and that, when read in conjunction with § 70502(e), officers of the United States must first investigate other indicia of nationality or registry. (*Id.*) Defendant again asserts that the vessel in this case claimed nationality through the markings on its hull, and he argues that the Coast Guard's failure to confirm that the vessel was "without nationality" by contacting the Colombian authorities to ask about the vessel's nationality and registration precludes a finding that the vessel was a "covered vessel" "subject to the jurisdiction of the United States." (*Id.* at 3.) Additionally, Defendant asserts that the government's interpretation of "flying" in 46 U.S.C. § 70502(e)(2) is inconsistent with congressional intent and maritime tradition. (ECF No. 58 at 4-8.)

Here, after careful consideration of the evidence of record and the applicable law, the Court is not convinced by Defendant's arguments and finds that the government has

met its burden of establishing jurisdiction under the MDLEA. Stated simply, the Court finds that the evidence of record, including the testimony of Officers Gomez and Di Egidio–which the Court finds credible–clearly demonstrates both that neither occupant of the vessel made a verbal claim of nationality or registry after being asked by Officer Di Egidio, and that neither occupant claimed to be the master or was identified as the individual in charge. *See* 46 U.S.C. 70502(d)(1)(A)-(D). As previously noted, the term "covered vessel" includes "a vessel subject to the jurisdiction of the United States,"*id.* § 70503(e), and "a vessel without nationality" is listed among the types of vessels subject to the jurisdiction of the United States." *Id.* § 70502(c)(1)(A). And as is relevant here, the statute defines a "vessel without nationality" as:

> a vessel aboard which no individual, on request of an officer of the United States authorized to enforce applicable provisions of United States law, claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e).

46 U.S.C. § 70502(d)(1)(D).

Ultimately, the evidence before the Court plainly indicates that, on the boarding officers' request, neither occupant of the vessel claimed to be the master or was identified as the individual in charge. Additionally, the Court finds that the vessel simply cannot be said to have had any other claim of nationality or registry under paragraphs (1) or (2) of subsection (e) of § 70502 because: (1) the record indicates that the boarding team surveyed the vessel for documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas and found none (nor did the occupants produce any), and (2) the Court is fully persuaded by the Eleventh Circuit's reasoning in *Obando* and finds, for the same reasons set forth in *Obando*, that painted flags do not fly for

10

purposes of making a claim of nationality or registry under 46 § 70502(e)(2).[2] *See Obando*, 891 F.3d at 935 ("That the Coast Guard may embrace a functionalist interpretation of how the master of a vessel may assert nationality in the interest of diplomatic caution cannot change the ordinary meaning of the statutory text.").

Furthermore, here, unlike in *United States v. Prado*, 933 F.3d 121 (2d Cir. 2019), a case on which Defendant relies, the evidence indicates that the officers followed the statutory procedure and asked the occupants of the vessel whether the vessel had a nationality.[3]  (*See, e.g.*, Tr. of 11/7/25 hearing at 63 (explaining that the occupants of the vessel both answered "no" when asked if they wanted to make a claim of nationality for the vessel).)  Thus, because neither occupant of the vessel identified himself as the master or

---

[2] As the court aptly explained in *Obando*:

> The ordinary meaning of the word "flying" requires a flag to be capable of freely moving in the air.  *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012) ("Words are to be understood in their ordinary, everyday meanings . . . .").  For example, Webster's New International Dictionary defines "fly" as "[t]o cause to fly or to float in the air as a . . . flag," and it offers the illustrative phrase of "the ship flew the flag of Spain." [ ] Webster's Third New International Dictionary gives a nearly identical definition. [ ] And the Oxford English Dictionary defines "fly" as, "[t]o set (a flag) flying; to carry at the mast-head; to hoist." [ ] All of these definitions entail the movement of a physical object in the air. Indeed, the Oxford English Dictionary applies the same definition of "fly" to the act of "set[ting] (a sail) loosely." [ ]
>
> To be sure, the ordinary meaning of a term will yield when the term has "a technical meaning" or is a "term[ ] of art," *see* Scalia & Garner, *supra*, at 73 (emphasis omitted), but the meaning that the phrase "flying a flag" carries in the maritime context confirms that a vessel's flag must be able to move freely in the air.  For example, the Oxford English Dictionary, in a section on "nautical phrases," defines "to keep the flag flying" as "to refuse to haul down one's flag and surrender." [ ]  A painted flag cannot be "haul[ed] down." [ ]

891 F.3d at 934 (some citations omitted); *see also id.* at 935-36 (explaining that maritime etiquette and other federal statutes about the display of flags support the same meaning of "flying" a flag).

[3] Additionally, the Court notes that *Prado* specifically declined to pass on the district court's ruling that the display of the flag of Ecuador affixed to the side of the vessel was not large or prominent enough to qualify as "flying" Ecuador's flag for purposes of 46 U.S.C. § 70502(e)(2).  *See* 933 F.3d at 131 ("We need not pass on the correctness of that ruling as a matter of law because nothing turns on it.")

person in charge and neither occupant made a claim of nationality, this case falls within § 70502(d)(1)(D) and not § 70502(d)(1)(B), which was at issue in *Prado*.

Finally, as the government correctly notes in its response brief, the only significant difference between the facts in *Obando* and the facts of this case is that, here, no master or person in charge was identified, and the Court agrees with the government that this distinction actually *favors* the government rather than the Defendant, as it eliminates any human claim of nationality that may have required diplomatic inquiry.

## **CONCLUSION**

For the foregoing reasons, the Court finds that the government has met its burden of proving that Defendant was aboard a covered vessel under the MDLEA within the United States' extraterritorial jurisdiction.  Accordingly, the Court denies Defendant's motion to dismiss (ECF No. 45).

**IT IS SO ORDERED.**

/s/Bruce H. Hendricks
United States District Judge

May 20, 2026
Charleston, South Carolina